*In the Matter of Northpoint Realty Partners, LLC*, No. 0062, Sept. Term 2024, Opinion filed on May 2, 2025, by Berger, J.

ZONING AND LAND USE – PRINCE GEORGE'S COUNTY – PGCC § 27-1704

PGCC § 27-1704(d) provides that "[d]evelopment approvals or permits of any type approved under the prior Zoning Ordinance or prior Subdivision Regulations or otherwise subject to this Section are 'grandfathered' and all buildings, uses, structures, or site features are deemed legal and conforming." PGCC § 27-1704(e) provides that "[s]ubsequent revisions or amendments to development approvals or permits 'grandfathered' under the provisions of this Section as authorized herein shall be reviewed and decided under the prior Zoning Ordinance . . . unless the applicant elects to have the proposed revision or amendment reviewed under Subsection (f)." PGCC § 27-1704(f) permits a developer to "elect at any stage of the development review process to have the proposed development reviewed under" the New Zoning Ordinance ("New ZO"). When a developer makes such an election, "[i]f the applicant desires to utilize an approval under the prior Zoning Ordinance and/or prior Subdivision Regulations . . . any buildings, structures, uses, or site features approved or constructed pursuant to the prior approval shall be 'grandfathered' and deemed legal and conforming, and all conditions of the prior approval(s) shall continue to be applicable to the proposed new development." The plain language of these provisions does not suggest that a revision or amendment is required before a developer may elect to have a detailed site plan reviewed under the New Zoning Ordinance using an approval obtained under the prior ordinance ("Old ZO").

ZONING AND LAND USE – PRINCE GEORGE'S COUNTY – PGCC § 27-3605(e)(2)

PGCC § 3605(e)(2) provides that a "[d]etailed site plan may only be approved upon a finding that . . . [a]ll conditions of approval in any development approvals and permits previously approved for the property have been considered and imposed as necessary to satisfy the applicable standards of this Subtitle." This subsection permits the Planning Board to consider unrevised and unamended approvals obtained pursuant to the Old ZO for the purposes of approving a detailed site plan under the New ZO if the Planning Board appropriately considers all applicable conditions of approval and imposes all conditions necessary to the approval.

ZONING AND LAND USE – STATUTES – RETROACTIVE OPERATION

Where zoning and land use laws are concerned, "a change in the law after a decision below and before final decision by the appellate Court will be applied by the Court unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent[.]" *Yorkville Corp v. Powell*, 237 Md. 121, 124 (1964). "[I]f the new law is procedural, the decision about retroactivity will turn on what aspect of the administrative/adjudication process is changed, at what point in the

administrative/adjudicative process the change is made, and the question presented to the reviewing court." *Grasslands Plantation, Inc. v. Frizz-King Enters., LLC*, 410 Md. 191, 227-28 (2009). Where a court is interpreting a procedural change to a zoning or land use law that will affect future development approvals, retroactive application of the New Zoning Ordinance's updated provisions is appropriate.

Circuit Court for Prince George's County
Case No. C-16-CV-23-002701

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 0062

September Term, 2024

_____

IN THE MATTER OF NORTHPOINT
REALTY PARTNERS, LLC

_____

Berger,
Beachley,
Hotten, Michele D.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed: May 2, 2025

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In December 2022, Northpoint Realty Partners, LLC ("Northpoint") filed a detailed site plan ("DET") and a tree conservation plan ("TCP") with the Planning Board of the Maryland National Capital Park and Planning Commission ("Planning Board") for approval of two commercial warehouses pursuant to the newly adopted zoning ordinance of Prince George's County. The DET concerned a development proposal for commercial/warehouse use on a thirty-three-acre portion of a larger 482.47-acre plot known as Westphalia. The Planning Board reviewed the DET in concert with a preliminary plan of subdivision ("PPS") that had been approved for all of Westphalia under the prior zoning code. Applying all the conditions of approval that the Planning Board found relevant to Northpoint's proposed development, the Planning Board approved the DET and TCP.

Following the Planning Board's approval, the Prince George's County Council sitting as the District Council ("District Council")[1] elected to review the approval of the DET and reversed the Planning Board's approval on procedural grounds related to the use of the prior PPS. Northpoint requested judicial review of this reversal, and in February 2025, the Circuit Court for Prince George's County determined that the District Council had erred as a matter of law by reversing the Planning Board's approval. The circuit court vacated the District Council's decision and remanded the case to the District Council to evaluate the DET and TCP on the merits.

---

[1] The Prince George's County Council handles all County legislative matters. When acting on zoning and land use issues, the same members sit as the District Council. For clarity, we will refer to this body as the District Council throughout this opinion even if some actions referenced were taken under the County Council's general responsibilities.

On appeal, the District Council presents one question for our review, which we rephrase slightly as follows:[2]

> Whether the District Council erred in reversing the Planning Board's approval of Northpoint's detailed site plan.

For the reasons explained herein, we shall affirm the decision of the circuit court.

## FACTS AND PROCEDURAL HISTORY

In 2021, the Prince George's County District Council adopted a Countywide Sectional Map Amendment ("CMA"). Pursuant to this CMA, all Prince George's County properties within the Regional District were rezoned under classifications established in the new zoning ordinance ("New ZO") and new subdivision regulations ("New SR"), which became effective on April 1, 2022. The 2021 CMA rezoned Northpoint's property, and all similarly situated properties, from the Mixed Use-Transportation Oriented Zone ("MXT") and Military Installation Overlay Zone ("MIO") to the Town Activity Center-Edge Zone ("TAC-E") and MIO Zone. MXT zoning permits retail, hotel, and office use. The change to TAC-E expanded those uses to include commercial/warehouse use.

## I. The New Zoning Ordinance

### A. Order of Approvals

One relevant change made pursuant to the New ZO concerns the order of approvals necessary for a developer seeking approval of a project. Pursuant to § 27-270 of the prior

---

[2] The District Council phrased its original question presented as follows:

> I. Was the District Council's final decision supported by substantial evidence, fairly debatable, and not premised upon an erroneous conclusion of law?

2

ordinance ("Old ZO"), the following was required: (1) zoning,[3] (2) conceptual site plan ("CSP"),[4] (3) preliminary plat of subdivision,[5] (4) detailed site plan ("DSP").[6] Under the New ZO, much of this process remains the same. The CSP, however, which the District Council and Planning Board deemed "redundant," was removed from the order of approvals.[7] The new order of approvals, therefore, is (1) zoning, (2) PPS, (3) DET.[8] PGCC § 27-2300 (2024).

Pursuant to § 27-3605, as it was written at the time Northpoint submitted its DET, one requirement for approval of a DET was that the "proposed development complies with

---

[3] The development must comport with the use requirements of the zoning classification in which the development is taking place.

[4] A conceptual site plan is a "very general concept for developing a parcel of land before subdivision plans or final engineering designs are begun." PGCC § 27-272(a)(1) (2013).

[5] The language of § 27-270 reads "preliminary plat of subdivision," while the new language uses "preliminary plan of subdivision." The word "plan" will be used throughout to describe this approval. A PPS is a "preliminary drawing (to scale) of a tract of land, depicting its proposed divisions into lots, blocks, streets, and other designated areas within a proposed subdivision." PGCC § 27-2300 (2024).

[6] Detailed site plans approved under the Old ZO are abbreviated "DSP," while detailed site plans approved under the New ZO use DET. (1) Detailed site plan ("DSP"): Shows "the exact location and design of all buildings and structures, streets, parking lots, open spaces, landscaping, grading, and other on-site physical features." Prince George's County Planning Department, *Detailed Site Plan (DET)*, https://perma.cc/333A-5CT7 (last viewed Apr. 28, 2025).

[7] Prince George's County Planning Board, *Site Plans, Departures, and Variances: Processes and Administrative Procedures in the New Zoning Ordinance*, https://perma.cc/Z2FZ-YZYQ (last viewed Apr. 28, 2025).

[8] Additional steps are required pursuant to both the Old and New ZO, but these steps are not relevant to our analysis here.

3

all conditions of approval in any development approvals and permits to which the detailed site plan is subject." PGCC § 27-3605(e)(2) (2022). Under both the Old ZO and the New ZO, a PPS must be approved before a detailed site plan can be approved. PGCC § 27-2300 (2024). For PPSs detailing major subdivisions, such as the one at issue here, the Planning Board is responsible for reviewing and rendering a final decision. The Planning Board also makes final approval decisions regarding DETs. PGCC § 24-3200 (2024); § 24-3311(b) (2024).

B.    **Transitional Provisions**

To handle the transition from the Old ZO to the New ZO, the New ZO includes several transitional provisions within § 27-1704. First, § 27-1704(a) sets forth, in relevant part, that,

> development approvals or permits of any type approved under the prior Zoning Ordinance or prior Subdivision Regulations prior to April 1, 2022 remain valid for the period of time specified in the prior Zoning Ordinance or prior Subdivision Regulations . . . If the approval is for a CPS [Conceptual Site Plan], special permit, Comprehensive Sketch Plan, or CDP [Comprehensive Design Plan], it shall remain valid for twenty years from April 1, 2022, or the date of its approval, whichever is later.

PGCC § 27-1704(a) (2024).

Until any "development or approval permit" expires, § 27-1704(b) permits a project to "proceed to the next steps of the approval process (including any subdivision steps that may be necessary) and continue to be reviewed and decided under the prior Zoning Ordinance and prior Subdivision Regulations." PGCC § 27-1704(b) (2024). Similarly, any "revisions or amendments to development approvals or permits 'grandfathered' under

4

the provisions of this Section shall be reviewed and decided under the prior Zoning Ordinance . . . unless the applicant elects to have the proposed revision or amendment reviewed under" the New ZO.  PGCC § 27-1704(e) (2024).  Once such approvals are no longer valid, "any subsequent development of the land shall be subject to the procedures and standards" of the New ZO.  PGCC § 27-1704(c) (2024).  The section permits an applicant to "elect at any stage of the development review process to have the proposed development reviewed under" the New ZO.  PGCC § 27-1704(f) (2024).  Section 24-1704 of the New SR includes comparable language related to subdivision approvals granted under the Old SR, and similarly permits an applicant to "elect at any stage of the development review process to have the proposed development reviewed under" the New SR.

## II.    The Northpoint Development

The development at issue here is part of a larger mixed-use site called Westphalia Town Center ("Westphalia").  The entire Westphalia site consists of 482.47 acres, 1352 lots, and 211 parcels of land.  Northpoint is the contract developer for thirty-three acres of Westphalia.  Before passage of the New ZO, Westphalia received approvals for a CSP (CSP-07004), PPS (PPS 4-08002), and two detailed site plans (DSP-12017 and DSP-12043) under the Old ZO.  PPS 4-08002 is for the entire 482.47 acres of Westphalia.  Westphalia's master developers obtained a six-year extension of the PPS in December 2023.

On December 11, 2022, Northpoint filed DET-2022-001 with the Planning Board, proposing the construction of two commercial warehouse buildings totalling 306,000

5

square feet on two separate parcels within the Westphalia site. On February 16, 2023, the Planning Board issued a technical staff report recommending approval of the DET with conditions. The DET, along with the Type 2 TCP, was unanimously approved by the Planning Board. In its final approval, the Planning Board discussed the prior approvals obtained under the Old ZO, including CSP-07004, which was approved in 2009. CSP-07004-01 was originally approved by the Planning Board with conditions in 2010, reconsidered in 2013, and finally approved with conditions by the District Council in 2014. CSP-07004-02 was approved by the Planning Board in 2019 but was subsequently withdrawn. The Planning Board explained in its resolution that the "current Zoning Ordinance does not recognize a CSP as a required application, therefore, the subject DET does not have to conform to the requirements of this approval, as it is no longer applicable."

The Planning Board also addressed PPS 4-08002, explaining that the "subject property has a valid Preliminary Plan of Subdivision" that was adopted on June 25, 2009. The Planning Board went on to write that this "DET has been filed pursuant to the current Zoning Ordinance; however, the property is subject to a PPS, which was approved, pursuant to the prior Prince George's County Subdivision Regulations." It noted that one requirement for approving the DET is that the "proposed development complies with all conditions of approval in any development approvals and permits to which the detailed site plan is subject." Here, the DET was "subject to the conditions of approval of PPS 4-08002." Of "the 54 conditions" included in the PPS, the Planning Board found that nineteen conditions applied to Northpoint's DET.

6

In reviewing each of the relevant conditions, the Planning Board addressed issues related to subdivision changes that had been made following approval of PPS 4-08002. For example, under PPS condition 19, the Planning Board explained that although a transit station had originally been identified on the approved PPS within the area of Northpoint's DET, the "master developer had filed a reconsideration of the PPS . . . and the subject application [had] been revised to remove this area from the bounds of this DET." The Planning Board also provided guidance for when a new or revised PPS may be necessary. Condition 42 sets forth that the total "development within the subject property shall be limited to uses which generate no more than 6,186 AM peak-hour trips, and 8,526 PM peak-hour trips," and indicates that any "development generating an impact greater than that identified herein-above shall require a new preliminary plan of subdivision with a new determination of the adequacy of transportation facilities."

Following approval of Northpoint's DET, the Prince George's County Council, sitting as the District Council, elected to "call up" the DET for review. The District Council ultimately reversed the Planning Board's approval of the DET and TCP. The District Council and the Planning Board agreed that Northpoint was "required to, among other things, comply with all conditions of approval in any development approvals and permits to which the DET is subject." The District Council, however, expressed a different interpretation of this requirement, finding that "under the New ZO, the Applicant was required to do more to capitalize on uses approved in the TAC-E/MIO Zone." It found that "under the Transitional Provisions of the New ZO and New SR, the Applicant was required (in the *first* instance) to revise or amend the appropriate approvals in order for this DET to

7

comply with the conditions of those prior development approvals." The District Council continued:

> Under the New ZO, a DET may only be approved if, among other things, "[t]he proposed development complies with all conditions of approval in any development approvals and permits to which the detailed site plan is subject." It is of no moment here, as the Board puts it, that the New ZO doesn't recognize a CSP as a required application. Worse, the Board ignores all together that the approved PPS (never revised or amended under the Transitional Provisions) was subject to the CSP land use limitations. Yet, the Board approved the DET subject to the PPS -- which was subject to the conditions of the approved CSP that limits the development of the property to residential, retail, office, or hotel uses.
>
> Under the New ZO, when a DET is required, the Order of Approvals does not require the filing of a CSP application. But here, the DET was already subject to an approved CSP . . . To be sure, why else would the Transitional Provisions of the New ZO and New SR "grandfather[]" projects that received development approvals prior to the effective date of the New ZO? And why else would those same Transitional Provisions permit subsequent revisions or amendments of those same "grandfathered" development approvals under either the New ZO or New SR? The legislative intent is clear. Subsequent development under the Old ZO or New ZO must conform to prior development approvals -- unless otherwise revised or amended -- pursuant to the appropriate Transitional Provisions.

The District Council concluded that,

> [b]ecause the Board's approval of this DET allows for commercial/distribution warehouse uses, which do not comply with the land uses approved in the CSP or PPS, the Board's decision was arbitrary, capricious, or otherwise illegal.

In reversing the approval by the Planning Board, the District Council relied on the transitional language in the New ZO that maintained the validity of CSPs and PPSs approved under the Old ZO. Because the previously approved CSP and PPS were

8

grandfathered, and because the New ZO provides that "subsequent revisions or amendments may be reviewed under the Old ZO (or SR) or the New ZO (or SR)," the District Council reasoned that Northpoint's DET, which had not been revised or amended, remained subject to both the prior CSP and the PPS approved under the Old ZO. The DET could not be approved for this use under the terms of the CSP and PPS because the Old ZO did not permit commercial/warehouse use in the applicable zone.

Northpoint filed a petition for judicial review with the Circuit Court for Prince George's County. In February 2025, the circuit court found that the District Council erred as a matter of law by reversing the Planning Board's approval. The court explained:

> A detailed site plan must comply with all conditions of approval in the development approvals and permits ***"to which the detailed site plan is subject."*** Under the new zoning ordinance, a conceptual site plan is not a prerequisite to obtaining a detailed site plan. Therefore, DET-2022-001 is not "subject to" the approved conceptual site plan, CSP 07004-01, and is not required to comply with the conditions contained therein.
>
> Additionally, the District Council was legally incorrect in its interpretation that the preliminary plan of subdivision was subject to the land use limitations of the conceptual site plan. The ordinance requires that the detailed site plan conform to all "conditions of approval" contained in PPS 4-08002; there is no requirement that the detailed site plan must comply with land use limitations contained in a now-obsolete conceptual site plan. PPS 4-08002 was approved with fifty-four conditions of approval, none of which explicitly limit development to the uses proposed in the conceptual site plan.
>
> The Planning Board correctly found that "[t]he DET is subject to the conditions of approval of PPS 4-08002." In its approval of DET-2022-001, the Planning Board determined that nineteen of the conditions of approval were applicable to the detailed site plan, and individually addressed how the detailed

9

site plan would comply with each applicable condition. The approved DET thus complied with all applicable conditions of the preliminary plan of subdivision to which it was subject.

Finding that the District Council wrongly denied Northpoint's DET and TCP on procedural grounds, the circuit court remanded the case for a determination on the merits of DET-2022-001 and TCP2-029-12-16. This timely appeal followed.

### III.    Subsequent Revisions to the New ZO

In July 2024, following the Planning Board's approval of DET-2022-001, the District Council's reversal of that approval, and the filing of this appeal, the District Council adopted CB-15-2024 "for the purpose of reconciling certain terms, procedures, and other language of the new Zoning Ordinance . . . revising certain procedures and regulations; and adding clarification language to further effectuate successful implementation of the County's new, modern, streamlined Zoning Ordinance." CB-015-2024, 2024 Leg. (Prince George's Cny. 2024) at 1. Two revisions are arguably relevant to this appeal. First, language was added to § 27-1704(f). As previously written, § 27-1704(f) read, "an applicant may elect at any stage of the development review process to have the proposed development reviewed under this Ordinance." PGCC § 27-1704(f) (2022). The revised section now includes the following language:

> If the applicant desires to utilize an approval under the prior Zoning Ordinance and/or the prior Subdivision Regulations applicable to lot(s) or parcel(s) in a project or development with multiple lots or parcels, any buildings, structures, uses, or site features approved or constructed pursuant to the prior approval shall be "grandfathered" and deemed legal and conforming, and all conditions of the prior approval(s) shall continue to be applicable to the proposed new development.

10

PGCC § 27-1704(f)(2) (2024).

Additionally, § 27-3605(e)(2) was changed. The previous language provided that a "detailed site plan may only be approved upon a finding that . . . [t]he proposed development complies with all conditions of approval in any development approvals and permits to which the detailed site plan is subject." PGCC § 27-3605(e)(2) (2022). The revised section now reads that for approval of a DET, one standard that must be met is that "[a]ll conditions of approval in any development approvals and permits previously approved for the property have been considered and imposed as necessary to satisfy the applicable standards of this Subtitle." PGCC § 27-3605(e)(2) (2024). These changes became effective on September 3, 2024.

## DISCUSSION

**Standard of Review**

When the District Council "calls up" a case previously reviewed by the Planning Board, pursuant to § 27-3605(d)(10)(B) (2024), "the District Council may, on its own motion, elect to review the Planning Board's decision on the detailed site plan, within thirty (30) days of the mailing of notice of the Planning Board's decision." It is only authorized to affirm, reverse, or modify the decision of the Planning Board, or to return the case to the Planning Board to take further testimony. PGCC § 27-3605(d)(10)(E) (2024). In concluding that the District Council is vested with appellate jurisdiction, we observed that the District Council "may not substitute its judgment for that of the [Planning Board], even if, had it been so empowered, it might have made a diametrically different decision. The circumstances under which it may overturn or countermand a decision of the [Planning

11

Board] are narrowly constrained." *Cnty. Council of Prince George's Cnty. v. Curtis Regency Serv. Corp., et al.*, 121 Md. App. 123, 137 (1998) (internal citation removed).

In reviewing the decision of an agency, we "look[] through the circuit court's . . . decision[], although applying the same standards of review, and evaluate[] the decision of the agency." *People's Couns. v. Surina*, 400 Md. 662, 681 (2007). The Maryland Supreme Court held in *Cnty. Council of Prince George's Cnty. v. Zimmer Dev. Co.*, 444 Md. 490 (2015), that "[t]he District Council's reversal of a Planning Board decision may be sustained by the courts, if at all, only when the Planning Board's decision is not supported by substantial evidence or is arbitrary, capricious, or illegal." *Zimmer*, 444 Md. at 578-79. "The appropriate standard to apply depends on whether the question on review is one of law, fact, or mixed law and fact[.]" *Crawford v. Cnty. Council of Prince George's Cnty.*, 482 Md. 680, 693 (2023).

The District Council contends that the validity of its decision to reverse the Planning Board's approval of Northpoint's DET is a mixed question of law and fact. We disagree. "Mixed questions of law and fact . . . arise when an agency has correctly stated the law, its fact-finding is supported by the record, and the remaining question is whether the agency has correctly *applied* the law to the facts." *Id.* at 695. Questions of law, on the other hand, "involve only the application or interpretation of law, regardless of the particular facts of a case." *Id.* at 694.

Here, the facts are not in dispute. A CSP and PPS were approved for the subject property under the Old ZO, when commercial/warehouse use was not permitted. Thereafter, the property was rezoned under the New ZO to permit commercial/warehouse

use. The New ZO discontinued use of CSPs in the approval process. Northpoint sought approval of a DET for commercial/warehouse use pursuant to the approved PPS. The Planning Board approved the DET after applying the conditions of the PPS it found relevant to Northpoint's DET. The question at the heart of this appeal is whether the District Council properly interpreted §§ 27-1704 and 27-3605 to require that Northpoint amend or replace the CSP and/or PPS approved under the Old ZO (because it did not contemplate commercial/warehouse use), or, as Northpoint contends, whether the New ZO requires only that developers conform to the applicable portions of a previously approved PPS. In our view, this is purely a question of law. Accordingly, we "look through" the circuit court's decision and review the District Council's decision de novo.

## I. The District Council erred in finding that Northpoint had not complied with the requirements of the New Zoning Ordinance and reversing the Planning Board's approval of Northpoint's DET.

The District Council argues on appeal that Northpoint's DET does not satisfy § 27-3605(e)(2) of the New ZO. The District Council contends that, because Northpoint elected to have its DET reviewed under the New ZO (while continuing to rely on the PPS approved under the Old ZO), it remained subject to all the conditions of the prior PPS and the prior CSP, including its permitted uses. To proceed with its development under the uses approved in the TAC-E Zone, the District Council maintains that Northpoint was

13

required to file a new or revised PPS based on the new use.[9]  In support of this contention, the District Council points to the New ZO's transitional language, which preserves the validity of CSPs and PPSs approved under the Old ZO for a period of time and notes that such approvals "are considered 'grandfathered' and subsequent revisions or amendments may be reviewed under the Old ZO or the New ZO." PGCC §§ 27-1704(a)-(e) (2024).  In its reply brief, filed after the effective date of CB-15-2024, the District Council further argues that the updated language in § 27-1704(f)(2) should apply retroactively and that it bolsters its argument that Northpoint's DET was subject to all conditions of the approved CSP and PPS for the MXT Zone, which prohibits commercial/warehouse use. PGCC § 27-1704(f)(2) (2024).

Northpoint counters that its DET was not subject to the prior CSP because the New ZO removed CSPs from the required order of approvals.  Use limitations imposed under the CSP approved while the subject property was zoned as MXT, therefore, are no longer relevant or binding on a DET being reviewed under the New ZO.  It further argues that the previously approved PPS remained valid pursuant to the transitional provisions and that nothing in the New ZO or New SR prohibited Northpoint from moving forward with its

---

[9] The District Council also argues that by failing to obtain a new or revised PPS, Northpoint failed to exhaust administrative remedies before seeking judicial review in this case.  The District Council contends that Northpoint was required to obtain a new or revised PPS before seeking approval of its DET but does not provide any authority that it was required to do so before seeking judicial review of this matter.  Whether Northpoint was required to obtain a new or revised PPS before approval of its DET was part of the very issue decided by the circuit court.  Simply because Northpoint had not sought an approval it did not believe it was required to submit did not bar it from seeking judicial review of the District Council's decision.

14

DET based on this PPS. In support of this contention, Northpoint explains that, although the PPS was approved while the property was zoned as MXT and did not contemplate commercial/warehouse use, the Planning Board considered the zoning change and revised use of the subject property in reviewing and approving the DET and properly reconciled PPS 4-08002 with the requirements of the New ZO. In doing so, Northpoint maintains that the Planning Board ensured that Northpoint's DET complied with "all conditions of approval in any development approvals and permits to which the detailed site plan is subject." PGCC § 27-3605(e)(2) (2022).[10]

## A. Preservation

As a preliminary matter, Northpoint maintains that the District Council's argument on appeal -- that Northpoint needed to obtain a new or revised preliminary plan of subdivision under the New ZO -- was not preserved because this argument was not raised before the Planning Board. Northpoint contends that when the Planning Board considered Northpoint's DET, it carefully reviewed the prior approvals of the PPS and provided comments and recommendations on implementation of the applicable conditions. Because no party objected to the Planning Board's consideration of the prior subdivision approvals before the Planning Board, and because, as Northpoint contends, the District Council's Final Decision did not articulate any basis for why the prior subdivision approvals would warrant disapproval of the DET, issues related to the subdivision regulations were not

---

[10] It is of note that the revisions to § 27-3605(e)(2) did not take effect until after both parties filed their initial briefs, so it does not form the basis for Northpoint's arguments on appeal. During oral arguments, Northpoint disagreed with the District Council that the changes should be applied retroactively to this action.

properly before the District Council. This failure to raise an issue before the administrative agency (the Planning Board), Northpoint argues, effectively precludes us from reviewing the issue here. We disagree.

Following its review of a DET, the Planning Board "shall approve, approve with modifications, or disapprove the detailed site plan within seventy" days of the application. PGCC § 27-3605(d)(7)(D). Following this decision, the "applicant or any aggrieved person may appeal the Planning Board's decision to the District Council, by filing a notice of appeal" within thirty days. PGCC § 27-3605(d)(10)(A). Alternatively, "the District Council may, on its own motion, elect to review the Planning Board's decision on the detailed site plan" within thirty days of that decision. PGCC § 27-3605(10)(B). The District Council's "decision on appeal shall be based on the record on appeal or election review[.]" PGCC § 27-3605(d)(10)(E). The record is comprised of "the detailed site plan application and all material and evidence submitted for consideration by the Planning Board, a transcript of the public hearing on the application, and any additional information or explanatory material deemed appropriate." PGCC § 27-3605(d)(10)(C).

Here, Northpoint is correct in its assertion that the specific issue of whether it was required to obtain a new or amended PPS was not directly raised during the Planning Board's review process. For several reasons, however, this did not preclude the District Council from addressing this question. First, the general issue of whether Northpoint's DET met the requirements of § 27-3605(e)(2) was raised before the Planning Board. During the hearing before the Planning Board, Northpoint responded directly to citizen comments that Northpoint had not met the "required findings" under that section,

16

specifically, "conformance with the preliminary plan of subdivision[.]" Northpoint went on to address "the comments that this project does not satisfy Section 27-3605(e)(2) which requires the [DET] application comply with all conditions of approval and prior applicable development applications." Northpoint argued that "as reflected in the staff report, the applicant has met all conditions set forth for approval in the TAC zone." Northpoint then went on to address concerns related to particular conditions of approval included in the PPS.

More importantly, in its resolution approving Northpoint's DET, the Planning Board relied on its interpretation of § 27-3605(e) and the transitional provisions of the New ZO. As the Planning Board explained, this "DET [was] filed pursuant to the current Zoning Ordinance; however, the property is subject to a PPS, which was approved pursuant to the prior Prince George's County Subdivision Regulations." As the first DET to come before the Planning Board following adoption of the New ZO, the Planning Board could not have reached a conclusion on approval of the DET without considering how the New ZO and its transitional provisions apply to Northpoint. To that end, the Planning Board then went on to specifically address § 27-3605(e)(2), holding that the "proposed development complies with all conditions of approval in any development approvals and permits to which the detailed site plan is subject."

The Planning Board then listed all approvals to which the DET was subject. This included CSP-07004-01 and CSP-07004-02. The Planning Board wrote that the "current Zoning Ordinance does not recognize a CSP as a required application, therefore, the subject DET does not have to conform to the requirements of this approval, as it is no longer

17

applicable." It also indicated that "the subject property has a valid Preliminary Plan of Subdivision." Finally, the Planning Board noted that a "detailed site plan for infrastructure (DSP-12017) and special purpose (DSP-12043) have been previously approved for the subject site, but do not contain any conditions of approval that are relevant to the subject application." Ultimately, the Planning Board concluded that the "DET is subject to the conditions of approval of PPS 4-08002. If the application is revised as conditioned herein, the proposed development will comply with all relevant previous conditions of approval."

When the District Council elected to review the Planning Board's approval of the DET, it also sought to address whether Northpoint's DET complied with the requirements of § 27-3605(e)(2). The Planning Board had found that the DET was in compliance with this section. It explained what prior approvals the DET remained subject to under the New ZO and how the conditions of those prior approvals should be applied. This, essentially, was a determination of how the transitional provisions of the New ZO apply to a developer seeking to proceed with development under the New ZO while relying on approvals obtained under the old code. The District Council's review, therefore, was predicated on its own interpretation of how this process should work. Since this was the first case of its type under the New ZO, the District Council was empowered and required to conduct its own analysis of this issue and render a decision regarding the validity of Northpoint's DET based on that analysis. In contrast to the Planning Board's findings, the District Council found that because the PPS was approved subject to the CSP, Northpoint's DET remained subject to the land use limitations contained in that CSP. Therefore, Northpoint would need a new or amended PPS to untether the DET from those restrictions. In this way, the

18

District Council's finding that Northpoint was required to file a new or revised PPS was not a novel issue raised for the first time, but rather a conclusion of law reached by its review of Northpoint's DET. Accordingly, this issue was properly before the District Council and is properly before this Court for review on appeal.

### B. Applicability of Revised Provisions

As a threshold matter, we must consider whether revisions to the New ZO added after this action commenced should apply to our analysis here. The District Council argues in its reply brief that the changed sections should apply. We agree. Although the general rule in Maryland is that "statutes are presumed to operate prospectively[,]" the courts have long recognized an alternative approach for zoning and land use matters. *McHale v. DCW Dutchship Island, LLC, et al.*, 415 Md. 145, 159-160 (2010).

In *Yorkdale Corp. v. Powell*, 237 Md. 121, 124 (1964), the Supreme Court of Maryland held that if a statutory change occurs "after a decision below and before final decision by the appellate Court[,]" it applies retroactively "unless vested or accrued substantive rights would be disturbed or unless the legislature shows a contrary intent[.]" The Court distinguished between substantive changes and procedural changes when determining retrospective effect, noting that a procedural change is "usually construed as operating on all proceedings instituted after its passage, whether the right accrued before or after that date." *Id.* at 127. "[A] law is substantive if it creates rights, duties[,] and obligations, while a remedial or procedural law simply prescribes the methods of enforcement of those rights." *Langston v. Riffe*, 359 Md. 396, 419 (2000) (internal citations omitted).

19

Following *Yorkdale*, the Court in *Luxmanor Citizens Ass'n, Inc. v. Burkart*, 266 Md. 631 (1972), declined to retroactively apply a new procedural statutory requirement that four members must vote affirmatively to approve a special exception. In holding that the change did not apply retroactively to invalidate the prior vote, the Court reiterated that "a legislative change in the law in regard to procedure, rather than in regard to substance, will be applied to matters and proceedings taking place after the effective date of the change in the law." *Luxmanor*, 266 Md. at 644-45.

Since *Yorkville* and *Luxmanor*, however, this bright line distinction between substantive and procedural changes has eroded. This erosion has occurred at least, in part, because outside the realm of zoning and land use, the opposite distinction generally holds. That is, "[d]espite the presumption of prospectivity, a statute effecting a change in procedure only, and not in substantive rights, ordinarily applies to all actions whether accrued, pending or future, unless a contrary intention is expressed[.]" *Mason v. State*, 309 Md. 215, 219-20 (1987). With this in mind, the Court in *Grasslands Plantation, Inc. v. Frizz-King Enters., LLC*, 410 Md. 191, 227-28 (2009) softened the line between substantive and procedural changes, explaining that "if the new law is procedural, the decision about retroactivity will turn on what aspect of the administrative/adjudication process is changed, at what point in the administrative/adjudicative process the change is made, and the question presented to the reviewing court."

In *Grasslands*, Queen Anne's County enacted two statutory changes during the course of litigation -- a procedural change affecting conformity with the county's Comprehensive Plan and a substantive change related to Emergency Services. *Grasslands*,

20

410 Md. at 200-03. The case turned on whether those new ordinances should apply to a disputed subdivision approval. Because the circuit court was already remanding the case for a new hearing due to an unrelated burden-of-proof error, the Court concluded that there was no reason not to apply both new laws during that proceeding. *Id.* at 228-29. In distinguishing *Grasslands* from *Luxmanor*, the Court explained:

> [I]n *Luxmanor*, we were looking backwards to see if an earlier administrative proceeding should be re-done for the sole purpose of applying the new procedural law. Here, because we remand to the Board for a new hearing due to the burden of proof issue, we look forward—to decide what should occur in the future, as the proceedings recommence. This *Luxmanor* difference in vantage point merits a different rule because we should not duplicate expenditure of the parties' and administrative agency's resources for a new hearing simply to apply a new rule, that is arguably procedural, when the hearing was done correctly in the first place.

*Id.* at 228.

Here, the changes in question can be described as procedural in nature because they prescribe the methods by which developers can acquire rights, duties, and obligations throughout the development process. We do not, however, view this classification as precluding the changes from applying retroactively to our analysis of the District Council's decision. In *Grasslands*, the Court cautioned against retroactive applications that would "duplicate expenditure of the parties' and administrative agency's resources for a new hearing simply to apply a new rule . . . when the hearing was done correctly in the first place." *Id.* at 228. The Court was correct, no doubt, that retroactive application of the voting procedures in *Luxmanor* would have done just that. This is not the case here where

21

the very question presented was whether the hearing before the Planning Board or the District Council was done correctly.

At oral argument, counsel represented that this is the first case exploring questions of interpretation surrounding the New ZO's transitional provisions. Accordingly, any interpretation will inform future DET approval procedures throughout the transitional period. To analyze and decide this case based on obsolete language would serve no meaningful purpose. As we will explore herein, alterations to the transitional provisions over time only serve to enhance our ability to elicit the legislative intent behind the New ZO's transitional provisions and answer the critical question of whether the District Council erred as a matter of law in its own interpretation of these sections. For these reasons, and because we discern no legislative intent directing exclusively prospective application of the relevant section and no effect on substantive or vested rights, we will conduct our analysis pursuant to the most current iteration of the New ZO, including changes made to the applicable sections in CB-15-2024.

### C. Legislative History

At the heart of this case is a question of statutory interpretation. To determine whether the District Council erred in reversing the Planning Board's approval of DET-2022-01, we must first determine whether the New ZO's transitional provisions required Northpoint to obtain a new PPS before proceeding with its DET. It is necessary to look to the District Council's intent in adopting the relevant provisions because this is not clearly spelled out in the New ZO. *Harford Cnty. People's Couns. v. Bel Air Realty Assocs. Ltd. P'ship*, 148 Md. App. 244, 259 (2002) ("Because this appeal requires us to

construe the language of the [Harford County] Zoning Code, '[t]he cardinal rule of [statutory construction] is to ascertain and effectuate the legislative intent.'"). In determining legislative intent, we look to the "normal, plain meaning of the language of the statute." *Lockshin v. Semsker*, 412 Md. 257, 275 (2010). We do not, however, "read statutory language in a vacuum, nor do we confine strictly our interpretation of a statute's plain language to the isolated section alone." *Id*. at 275. Rather, "the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* at 276.

Here, the legislative history of Prince George's County's Zoning Ordinance sets forth the District Council's intent in establishing the new ordinance and its transitional provisions. In a 2023 Committee Report, the District Council explained that "the underlying intent of the development of the County's new Zoning Ordinance was to comprehensively replace the prior Zoning Ordinance, which had not been subject to a systemic update in more than 50 years." The District Council explained, in relevant part:

> When a jurisdiction attempts to replace existing zoning and land use regulations, a central consideration is dealing with projects and development completed or initiated under the prior regulations that may be caught up in a transition to new regulations . . .
>
> In response the Council approved the transitional provisions of the new Zoning Ordinance and Subdivision Regulations, informally known as "grandfathering provisions" . . .
>
> The approved transitional and grandfathering provisions were designed to avoid interference with ongoing projects, including new projects that were about to be submitted or that would be submitted and accepted prior to April 1, 2024.

23

> The enacted transitional provisions cover previously built development, projects that had submitted applications that were not yet decided when the new codes took effect, and future applications that would be part of a "grandfathered" chain of entitlements. To protect projects that were contemplated by property owners and developers but that had not yet filed an application, the Ordinance allowed, at the sole discretion of the application, an unrestricted two-year overlap period . . . A first application, accepted for processing before April 1, 2024, also allows that project to obtain the remainder of its entitlements using the prior codes.

Prince George's Cnty. Council, Planning, Hous. & Econ. Dev. Comm., Comm. Rep., CB-014-2023, 2023 Sess. at 2-3.

This language indicates that the "reasons behind the transitional and grandfathering provisions adopted by the Council" are grounded in concerns that developers with prior approvals may be "caught up" in the transition. *Id.* at 3. With these concerns in mind, the District Council included transitional provisions to "avoid interference with ongoing projects" and "protect projects that were contemplated" before the New ZO took effect. *Id.* To do so, the transitional provisions "allow" projects to proceed for a limited period of time under the prior codes.

These transitional provisions, however, were intentionally limited by the District Council, because "the new Zoning Ordinance expressly encourages development in accordance with the New Zoning Ordinance, rather than the limited authority of the prior Ordinance[.]" CR-004-2023, 2023 Leg. (Prince George's Cnty. 2023) at 3. The New ZO provides that the grandfathering period would not exceed two years from the effective date. *Id.* The New ZO also limits the validity of a CSP approved under the Old ZO, which previously never expired, to twenty years. CB-14-2023, Planning Board Analysis (2023)

24

at 2. As the District Council explained, for developers with concerns about how the transition would affect current projects and established developments, "the best response is targeted transitional language that broadens access to uses formerly available under the prior Zoning Ordinance for a determined -- and limited -- period of time." CB-014-2023, Comm. Rep. at 3.

Along with the transitional provisions that temporarily permit developers to continue seeking approval under the Old ZO, the New ZO also permits an applicant to "elect at any stage of the development review process to have the proposed development reviewed under" the New ZO. PGCC § 27-1704(f). That is, although projects in progress may continue to be governed by the Old ZO if it benefits them, they have the choice at any point during the approval process to change course and be reviewed under the New ZO before they are required to do so.

### D. Legislative Intent

In deciphering the legislative intent, we begin with the District Council's interpretation of § 27-1704(a)-(e) that "subsequent development under the Old ZO or New ZO must conform to prior development approvals -- unless otherwise revised or amended -- pursuant to the appropriate Transitional Provisions." If this was not the case, the District Council asks

> [w]hy else would the Transitional Provisions of the New ZO and New SR 'grandfather[]' projects that received development approvals prior to the effective date of the New ZO? And why else would those same Transitional Provisions permit subsequent revisions or amendments of those same 'grandfathered' development approvals under either the New ZO or New SR?

25

Notably, the District Council's own reasoning throughout the legislative process answers those questions. The "transitional and grandfathering provisions were designed to avoid interference with ongoing projects," not to tie developers who elect to be reviewed under the New ZO to conditions of prior approvals that no longer apply. Comm. Rep., CB-014-2023 at 3. Doing so would work in direct contradiction with the District Council's goals of transitioning to the New ZO.

The language the District Council points to regarding revisions and amendments does not suggest in its plain language or in any reasonable interpretation that such a revision or amendment is *required* before a developer may elect to have a DET reviewed under the New ZO. Rather, subsequent revisions or amendments *may* be reviewed under the Old ZO or New ZO. *See* § 27-1704(e). This appears in line with the intent of the transitional provisions to provide flexibility to developers who began the approval process under the Old ZO and are considering how best to proceed. The provision does not say that a developer *must* revise or amend a development proposal before proceeding under the Old or New ZO, but rather that any revisions or amendments a developer chooses to make may be reviewed under either ordinance. In other words, should a developer begin the process under the Old ZO and then subsequently revise a proposal after enactment of the New ZO, that developer is still afforded the flexibility to proceed under either ordinance. We do not read this provision to mandate that any developer revise or amend a development proposal before that flexibility becomes available.

Next, we turn to § 27-1704(f)(2). The District Council argues that the addition of this subsection establishes that a developer who chooses to proceed with review under the

26

New ZO while relying on a PPS (or other approval) approved under conditions of the Old ZO is limited by all conditions of the previous approval, including use limitations that no longer apply under the New ZO. We disagree. The language of § 27-1704(f)(2) provides that "any building, structures, uses, or site features approved or constructed pursuant to the prior approval shall be 'grandfathered' and deemed legal and conforming, and all conditions of the prior approval(s) shall continue to be applicable to the proposed new development." PGCC § 27-1704(f)(2) (2024). When viewed within the context of the full statutory framework to which it belongs, the addition of this subsection can be understood as furthering protection for developers midway through the development process at the time the New ZO was adopted. Similarly, we do not read this subsection as restricting the ability of developers who began the process under the Old ZO from electing to be reviewed under the New ZO at any point during the approval process.

Finally, the revisions made to § 27-3605(e)(2) further confirm this interpretation. The previous language was a major source of disagreement between the two parties, who differed on what conditions of approval the DET continued to be subject to under the New ZO. The District Council has argued throughout this case that developers proceeding under the New ZO remain subject to all conditions of all prior approvals. The new language of § 27-3605(e)(2), however, removed the vague language regarding approvals to which the DET is subject, and replaced it with a clear directive that before approving a DET, the Planning Board "considered and imposed as necessary" "any development approvals and permits previously approved for the property." PGCC § 27-3605(e)(2) (2024). This language clarifies that developers who elect to proceed under the New ZO (while relying

on approvals obtained under the Old ZO) are not, as the District Council argues, limited to *all* the conditions of prior approvals. Rather, the Planning Board is directed to consider and impose only those conditions necessary under the circumstances of each DET. This is consistent with the language throughout the New ZO's transitional provisions, which emphasizes the need to smooth the transition from the Old ZO to the New ZO.

Here, Northpoint began the development approval process under the Old ZO when the property in question was zoned as MXT and did not permit commercial/warehouse use. Following adoption of the New ZO, which rezoned the property to a TAC-E zone that does permit this use, Northpoint submitted a DET for the development of two warehouses on the property. The District Council is correct in its assertion that the New ZO did not completely do away with CSPs. The transitional provisions provide extended validity for CSPs approved under the Old ZO so that developers who began the process using the Old ZO may proceed to completion under the old provisions without complications. Nonetheless, the transitional provisions *allow* a developer to continue using its prior CSP as a protective measure. These provisions do not, however, demand that developers who wish to proceed to review under the New ZO -- the ultimate goal of the New ZO -- become "caught up" by old approvals that are no longer relevant to current development goals under the new rules.

In reviewing DET-2022-001 for approval under the previous language of §§ 27-1704(f) and 27-3605(e)(2), the Planning Board determined that the DET was no longer subject to the previously approved CSP, because CSPs were no longer included in the order of approvals. For that reason, the Planning Board did not impose the land use

28

limitations included in the CSP to either the DET or the PPS. The Planning Board did, however, still review and consider the conditions of approval included in PPS 4-08002, which was still a required and applicable approval. Even under the previous language of § 27-3605(e)(2), the Planning Board's analysis was consistent with the intent behind the transitional provisions when it determined which prior approvals the DET was subject to and applied them accordingly.

The revisions to § 27-3605(e)(2) only fortify the fact that the Planning Board's interpretation of the applicable provisions was sound. In determining the prior approvals to which the DET was subject, the Planning Board did exactly what the new language instructs. It "considered and imposed as necessary" the "development approvals and permits previously approved for the property." PGCC § 27-3605(e)(2) (2024). It reviewed all fifty-four conditions included in the PPS -- which was approved for the entire 482.47 acres of Westphalia -- and determined that nineteen of those conditions were relevant to the thirty-three acres included in Northpoint's DET. It made notes along with conditions that may, in the future, require a new or revised PPS, but did not find that such a submission was necessary at the time of approval to "satisfy the applicable standards" of the New ZO.

This process of review fell well within the required standards set forth for the Planning Board in reviewing DETs. As the body responsible for reviewing and approving both PPSs and DETs, the Planning Board is well situated to analyze each DET in concert with all previous approvals -- whether obtained under the Old ZO or the New ZO -- and ensure that the proper conditions are imposed on developers to further the county's goals. We recognize the District Council's concerns surrounding the smooth transition from the

Old to the New ZO. Nevertheless, the District Council's interpretation of the New ZO's transitional provisions imposes barriers to this transition that are not supported by the language or intent of the ordinance. The Planning Board's analysis, which considered all prior approvals and applied all relevant conditions of those approvals as necessary, was consistent with the spirit and goals of the New ZO, and its decision approving Northpoint's DET was supported by substantial evidence and was not arbitrary, capricious, or illegal.

## CONCLUSION

For these reasons, we hold that the District Council erred as a matter of law when it found that the Planning Board's approval of DET-2022-001 and TCP2-029-12-16 was arbitrary, capricious, or otherwise illegal. We, therefore, affirm the finding of the circuit court and remand the case to the District Council for a decision regarding approval of the DET and TCP consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. CASE REMANDED TO THE DISTRICT COUNCIL FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLANT.**